IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| STATE OF WASHINGTON, | No. 83095-3-I |
| Respondent, | DIVISION ONE |
| v. | |
| JOSHUA JAMES LUCAS, | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, A.C.J. — A jury found Joshua Lucas guilty of two counts of domestic violence assault committed against his wife, Bianca Lucas.[1] Lucas contends on appeal that statements from a testifying police officer were improper opinion testimony and that double jeopardy bars his conviction for the second assault because it was part of the same course of conduct. Because the officer did not opine on the credibility of another witness and the assaults were sufficiently distinct to be charged separately, we affirm.

**FACTS**

Joshua Lucas was charged with three counts of assault in the second degree and one count of assault in the fourth degree. All four counts were based on alleged domestic violence against his wife, Bianca Lucas, on November 23, 2019 in Oak Harbor, Washington. Slight differences exist between Bianca's

---

[1] Because Joshua and Bianca share a last name, we will refer to him as Lucas and her as Bianca for the sake of clarity.

Citations and pin cites are based on the Westlaw online version of the cited material.

initial recounting of events to the police, her testimony at trial, and Lucas's testimony at trial.

In her written statement to the police, made two days after the events, Bianca described the sequence:

> Joshua Lucas (my husband) and I had [sic] went out for a date. I became mad that while being drunk I thought we has trying to get with another woman. I then did smack him in the face. He then walked away and I followed yelling at him. He then asked me to "leave him alone." After me still following Joshua [] struck me in the head with the car lighter and walked away for about 10 min[utes]. I sat in the car and when he came back we drove home. After arriving home he then told me "to get out." I did not. [I]nstead I asked him to please relax and can we talk. I then leaned over to the driver side of the car where he was. Joshua then grab[b]ed me by the hair and told me to get off of him. I am not sure if he then struck me in the face or if I hit the dash. My mother . . . then open[e]d the passenger side door and pulled me to get me out. [M]y foot then came up and struck Joshua in the face. [H]e then bit my leg. [I]n return I punched him in his head until he let go. I then grab[b]ed the keys out of the car and tossed them out. I exited the car at this point. Joshua followed saying "give me my keys I just want to go[.]" I attempted to push him away in return he wrap[p]ed his arms around me to keep me from hit[ting] him. [M]y mother then starting grab[b]ing at his arms to get him off. When he let go he pushed me off causing me to fall on top of my mother. I then got angry ag[a]in and attempted to strik[e] again. [I]nste[a]d walking away He [sic] then got his keys and left.

Bianca suffered a circular second-degree burn on her forehead consistent with a burn caused by car cigarette lighter. Marks on her neck indicated being choked with a broad object in front of her throat and "clawing at it to remove it." Her nose was broken. She had a bite mark on her leg and wounds on her forearms consistent with defensive wounds.

Bianca's testimony at trial differed in some significant ways from the statement she gave to the police. As in her report, she confirmed being jealous,

2

slapping Lucas, and following him outside when he left. She testified that they argued near the car, she pushed and yelled at him, and he walked off for at least long enough for her to smoke a cigarette. She confirmed having to use the car lighter to light that cigarette and recounted the two of them once again fighting while Lucas was holding it to light his own. After he returned from walking they drove to their home, which took "[f]ive minutes at the most." She described the fight renewing throughout the drive and continuing once they had parked at home. She testified that her mother dragged her out of the car while Lucas bit her leg. But she denied having knowledge of when her forehead was burned or how her nose was broken, and denied that Lucas ever put his arms around her neck.

Lucas testified that after Bianca slapped him he went outside to smoke a cigarette and it was then, while he was lighting it, that Bianca pushed him and was, presumably, burned in the process. He reported that, as she continued to hit him, he put his hands up and moved away, and that she followed him in the parking lot. He testified that he walked away for around half an hour to "let things cool down." When he returned, he drove them both back home, which took around three minutes, as she screamed at and hit him. He testified that once he had parked Bianca continued to strike at him until her mother came out to pull her from the car, and it was then that he bit Bianca's leg in a bid to disentangle himself.

The jury found Lucas guilty of assault in the fourth degree—the cigarette lighter burn—and of assault in the second degree—the bite.

3

Lucas appeals.

## ANALYSIS

Lucas raises two challenges on appeal. First, he contends that certain statements made by Sgt. Jennifer Gravel were improper opinion testimony about Bianca's credibility that were deliberately elicited by the prosecutor, constituting reversible misconduct. Second, he asserts that counts one and four constitute the same assault under a double jeopardy analysis and that he cannot, therefore, be convicted of both. We disagree and affirm.

### Opinion Testimony

We turn first to Sgt. Gravel's testimony. Witnesses may not testify about the credibility of other witnesses because it "invades the province of the jury as the fact finder in a trial." State v. Demery, 144 Wn.2d 753, 764, 30 P.3d 1278 (2001). Testimony from police officers, because it carries an " 'aura of special reliability and trustworthiness,' " is of particular concern. Demery, 144 Wn.2d at 763 (internal quotation marks omitted) (quoting United States v. Espinosa, 827 F.2d 604, 613 (9th Cir. 1987)). For a prosecutor to deliberately elicit this sort of improper opinion testimony is misconduct. State v. Hawkins, 14 Wn. App. 2d 182, 189, 469 P.3d 1179 (2020). Where an error is not objected to at trial—whether it is the admission of improper opinion testimony or prosecutorial misconduct—it is not appealable absent a showing that the error is "manifest"; of a constitutional nature and prejudicial to the defendant. RAP 2.5(a); State v. Kirkman, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007).

Here, the challenged testimony arose from two exchanges. The first occurred near the beginning of Sgt. Gravel's time on the stand as she explained her background:

> Q: So since becoming a fully commissioned law enforcement officer, can you estimate how many reports of domestic violence you investigated?
>
> A: I – I couldn't even begin, I'm so sorry.
>
> Q: Is it in the tens?
>
> A: Oh, definitely more than the tens.
>
> Q: Hundreds, maybe?
>
> A: Yes. I would say, you know, probably more than 100 per year.
>
> Q: Okay. And that's since joining Oak Harbor Police Department in 2008?
>
> A: Yes.
>
> Q: Do you make an arrest every time there is a domestic violence investigation?
>
> A: No.
>
> Q: Let's switch gears and talk about November 23rd, 2019.

Sgt. Gravel went on to testify about being called to take Bianca's police report and otherwise investigate the aftermath of the events of November 23. She testified that after interviewing Lucas she "advised [him] that, based on the statements that have been made and the evidence, that he was under arrest for assault." Neither of the quoted statements led to an objection at trial; both are the bases for Lucas's appeal on this issue.

We conclude that Sgt. Gravel's statements did not constitute opinion testimony, nor did the prosecutor's question evince an intent to elicit opinion testimony. Sgt. Gravel's statements were not, on their face, testimony about

5

Bianca's credibility. They did not directly reference Bianca's testimony or express a belief about the facts of this case. And the prosecutor's questioning was not calculated to elicit opinion testimony, it simply sought to explain to the jury the process of police investigation and demonstrate Sgt. Gravel's expertise.

Lucas contends that the challenged statements constitute opinion testimony because "[a]s a result of the prosecutor's tactics, the jury was told either directly or by obvious implication that Gravel believed Bianca's allegations." But such a tenuous inference does not support concluding that the testimony was an opinion on Bianca's credibility. To hold otherwise would be to ignore other evidence that may have led to a charging decision, such as Bianca's physical state or Lucas's statements when interviewed. And, of course, it is necessarily implied in *every* criminal trial that law enforcement believed—either as a result of witness testimony or other evidence—that there was sufficient evidence to recommend charges.

It is true that the prosecutor's line of questioning does not appear to have been aimed at eliciting admissible testimony. Testimony is relevant where it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Irrelevant testimony is inadmissible. ER 402. Whether Sgt. Gravel has referred previous cases for prosecution does not speak to the particular facts at issue in this action. Any objection to this line of questioning by the prosecutor should have been sustained. But no such

6

objection was made, and admissibility of the testimony under the rules of evidence is not the issue in front of us.

We find no error. Sgt. Gravel's statements were not opinion testimony and the prosecutor did not seek to elicit such testimony.

<u>Double Jeopardy</u>

Lucas next contends that his two assault charges should count as only one under a double jeopardy analysis. Because the assaults were sufficiently distinct regardless of whose testimony is given credence, we disagree.

Both the United States constitution and our Washington constitution prohibit a person being placed in jeopardy twice for the same offence. U.S. CONST. amend V; WASH. CONST. Art. 1, § 9. This prohibition applies in several circumstances: to protect a person from re-prosecution after acquittal; to protect a person from re-prosecution after being convicted; and to protect a person from "receiv[ing] multiple punishments for the same offence." <u>State v. Villanueva-Gonzalez</u>, 180 Wn.2d 975, 980, 329 P.3d 78 (2014). This last application is at issue here. We review double jeopardy claims de novo. <u>Villanueva-Gonzalez</u>, 180 Wn.2d at 979-80.

We begin our analysis by determining whether the defendant has committed more than one offense, applying a "course of conduct" test. <u>Villanueva-Gonzalez</u>, 180 Wn.2d at 984-85. "There is no bright-line rule for when multiple assaultive acts constitute one course of conduct." <u>Villanueva-Gonzalez</u>, 180 Wn.2d at 985. Instead, we engage in a fact-specific inquiry considering the following factors in the context of the totality of the circumstances: (1) the length

7

of time over which the assaultive acts took place; (2) whether the acts took place in the same location; (3) the defendant's intent or motivation for the different assaultive acts; (4) whether the acts were uninterrupted or whether there were intervening acts or events; and (5) whether there was an opportunity for the defendant to reconsider their actions. Villanueva-Gonzalez, 180 Wn.2d at 985.

In Villanueva-Gonzalez, the defendant head butted his victim, grabbed her neck, and held her against furniture all in a short period of time and at the same location without indication of intervening events, a change in motivation, or a pause for him to reconsider his actions. The court held that he had committed only one assault. 180 Wn.2d at 985-86. Similarly, where the defendant in In re Personal Restraint of White pointed a gun at his victim, threatened her, threw her to the floor, beat her, and began to strangle her in one uninterrupted sequence with the same motivation throughout, only one assault had occurred. 1 Wn. App. 2d 788, 795-96, 407 P.3d 1173 (2017).

Here, in contrast to those cases and despite the inconsistency of testimony over time and between Bianca and Lucas, the facts indicate a notably different set of circumstances. Unlike in Villanueva-Gonzales and White, a not insignificant amount of time passed between Lucas burning Bianca with the cigarette lighter and him biting her leg. The shortest calculation of that period encompasses the time it took Bianca to smoke a cigarette and for the two of them to then drive home, a trip of at least three minutes. The longest calculation, relying on Lucas's testimony, indicates that he took a half-hour walk after burning her before returning to drive her home. Regardless, a significant amount of time

passed. Also distinguishing the facts of this case from those of <u>Villanueva-Gonzales</u> and <u>White</u> is that the two acts took place at different locations and with intervening events between them. And Lucas indisputably had time to reconsider his actions as he walked and Bianca smoked.

Considering the facts in their totality, even when understood in a light favorable to Lucas—that is, with as little temporal and emotional distance between them as the testimony permits—we conclude that his actions constitute two separate assaults and double jeopardy was not violated.[2]

We affirm.

*Smith, A.C.J.*

WE CONCUR:

*Coburn, J.*

---

[2] The State in its briefing demonstrates concern over the impact on our double jeopardy analysis of events at sentencing. At sentencing the State represented that "with respect to Mr. Lucas's criminal history, he has no prior criminal history and the underlying events involved the same time, place and victim. So for offender score purposes, Mr. Lucas is at a zero." But analysis under double jeopardy focuses on "the allowable unit of prosecution and involves the charging and trial stages. The 'same criminal conduct' claim involves the sentencing phase." <u>State v. French</u>, 157 Wn.2d 593, 611, 141 P.3d 54 (2006). The conclusions of these two tests may at times be the same. <u>See, e.g.</u> <u>White</u>, 1 Wn. App. at 795. But they are ultimately distinct, and we are not asked to revisit the appropriateness of Lucas's sentence.